IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRANDON L. SANTIFER,

    Petitioner,　　　　　　　　No. CIV S-05-2513 MCE GGH P

  vs.

M. EVANS, Warden,

    Respondent.　　　　　　　　FINDINGS & RECOMMENDATIONS

_____/

*Introduction and Summary*[1]

      This case involves the volatile mixture of immaturity, alcohol and a firearm. As is too often the case, the result of the mixture is a premature death. Petitioner was found guilty of second degree murder. This conviction was enhanced pursuant to Cal. Penal Code 12022.53(d) as the jury found that petitioner had discharged a firearm for a qualifying, underlying felony (murder) which caused death or great bodily injury. Petitioner was also convicted of being a felon in possession of a firearm.

      The court sentenced petitioner to 15 years to life for the second degree murder, a consecutive 25 years to life for the enhanced firearm charge, and stayed a three year sentence for

---

[1] The undersigned appreciates the well briefed positions of both parties.

felon-in-possession.

For the reasons set forth below, the petition should be denied.

*Facts*

The background facts in this case are taken verbatim from the opinion of the Court of Appeal, and are set forth below. As necessary, the court has supplemented the facts.

    A.   Prosecution's Case in Chief

Lisa Baylor was living with her three children in the Shadowbrook apartment complex, in Sacramento on May 1, 2002. Defendant had known her for one year and a half and was friends with her husband, Keith Smith. Smith was not living with Baylor at the time because he was in prison.

Two weeks prior to May 1st, Baylor met Travell Collins, the victim in this case. The two developed a relationship and Collins sometimes spent the night at Baylor's apartment.

On the evening of May 1st, defendant visited Baylor at her apartment and asked about Smith, whether she had heard from him, and whether she had his address. Baylor and defendant went to the liquor store in defendant's car and when they returned, they started drinking. Sometime later, defendant asked Baylor about Collins and she told him she was having a relationship with Collins.

Baylor, Collins and defendant stood around talking and everything between them appeared "to be pretty cool." However, several hours later, there appeared to be some tension between them. They were drinking and defendant and Collins both seemed to be under the influence of alcohol. When Collins drank, he became argumentative. It appeared to one neighbor that Collins and defendant were having an argument. Suddenly, Collins started to remove his jacket as if he was going to fight. Defendant walked back towards Baylor, reached under his sweatshirt, and pulled out a semi-automatic handgun and a clip, which he inserted into the gun. He chambered a round, said, "fuck this," and shot Collins in the stomach while Collins stood there with his arms in the air. Collins fell to the ground and curled up on his side. After

standing there for a moment, defendant walked towards Collins who said, "I'm already dead. Don't kill me." Defendant said "fuck you," stood over Collins and shot him several more times and then ran off. [FN2. Descriptions of the shooting by several neighbors who heard the shots ranged from four to seven shots followed by a 10-40 second interval followed by another four to seven shots.]

After seeing the shooting, Baylor went to her apartment. By the time she reached it, defendant was behind her and told her to "get me out of here." She was scared and started to cry but he said, "no, man, fuck that thing." So the two of them headed back to the parking lot where they got into Collins' car. Defendant sat in the passenger seat and Baylor drove. He told her to take him to an apartment complex on Marconi and directed her to an apartment.

After they arrived at the complex, defendant told Baylor three or four times, "tell them [you] didn't see anything" and "[y]ou didn't see anything, right?" Defendant borrowed a cordless telephone from someone at the apartment complex and telephoned Lester Jones who he told to "come to the house, I just shot this nigga. I just shot this fool." Ten minutes later, Jones arrived. Defendant told Baylor to leave, go to the store and buy some liquor, then go back to Shadowbrook, and if anyone asked her, she was to tell them she just went to the store.

Baylor took the car and drove to the Safeway store at Arden and Watt Avenue where she made a purchase. As she left the store, she felt she could not drive anymore. She was confused and was feeling the effects of the alcohol she had been drinking, so she telephoned her father's apartment. Her mother came and picked her up at the store.

Officers found Collins' lifeless body laying in a fetal position. A cell phone was recovered from his hand and a test of his blood alcohol level indicated it was .07 percent. Fourteen shell casings were found near his body and 10 bullet holes were later found in the concrete where his body had been. Additional live rounds were also recovered from a nearby garbage can. Since 1994, a lawfully purchased clip for a semi-automatic would only hold 10 rounds.

1    An autopsy of Collins' body revealed that he had suffered 14 separate gunshot
2 wounds.  There were five entry wounds located on the backside of his body and three wounds
3 located on the back of his left arm.  Several of the shots were potentially fatal, including one that
4 struck his skull, one that went through both his lungs, the esophagus, and his aorta; another that
5 went through his abdomen, vital organs, both kidneys, and his spine; another that damaged major
6 vessels in the pelvic area; and a shot that fractured the humorous [sic].  The physician who
7 performed the autopsy opined that the wounds to Collins' back were consistent with someone
8 standing over his motionless body, and firing downward at him.  He also concluded that Collins
9 could have survived the initial shot to his stomach had he received immediate medical treatment.

10    B.  Defense

11    Defendant testified in his own behalf and gave the following version of the events
12 that took place the night of the murder.  He was drunk when he shot Collins.  He went to the
13 Shadowbrook apartments to visit friends and later when he saw Baylor and Collins in the parking
14 lot, he went over to talk to Baylor.  Collins walked away and when he returned, he seemed
15 bothered by something.  Defendant borrowed Collins' cell phone to make a call.  As defendant
16 was talking to someone named Tex, Collins took off his jacket.  Speaking to Tex, defendant said,
17 "look at this fool."  Tex immediately left.  Defendant turned towards Collins and thought he saw
18 something in Collins' hand.  He could not tell what it was, but he was scared because it looked
19 like a gun, so he ducked down between two cars, and pulled his gun from his waistband.  The
20 gun was loaded and had a round in the chamber.  He pointed the gun at Collins, but Collins kept
21 moving towards him holding the item in his hand, so defendant shot him.  Defendant did not
22 know how many shots he fired.  Afterwards, he went to find Baylor, but as he passed Collins,
23 Collins was getting up, using his right arm.  Defendant was scared that Collins would shoot him,
24 so he shot him again although he did not remember how many times he fired the gun. [FN3.
25 Defendant denied that Collins said "don't kill me," and that he responded by saying "fuck you."
26 He also denied reloading the gun before shooting Collins again.]  A couple of days after the

shooting, defendant went to Phoenix, Arizona where his family lived. He later turned himself in.

On August 23, 1999, Travell Collins stabbed an apartment manager in the shoulder. The attack was unprovoked.

People v. Santifer, 2004 WL 1966063 (3rd Appellate Dist. 2004).

*Issues*

1. Whether preclusion of an alleged spontaneous statement by petitioner unfairly impacted his right to prove self-defense;

2. Whether preclusion of reference in final argument to a specific reference of another allegedly similar situation violated fundamental fairness;

3. Whether the firearm enhancement sentence (a consecutive 25 years to life) constituted cruel and unusual punishment.

*Standard of Review*

The parties have spent some effort in characterizing the correct standard of review in this case. So many courts, and panels within the Ninth Circuit, have enunciated standards for AEDPA review with different shades of deference owed to the state courts that it is beginning to be problematic to set forth a standard of review which will be acceptable to all in this case. Therefore, the undersigned will use his standard definitional analysis which for the most part uses the words of the Supreme Court itself rather than the filtering of such words by other courts.

The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an

"unreasonable application of" that law. Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

The decisions of the circuit courts are not totally irrelevant to this analytical process as such decisions may explicate the controlling Supreme Court authority.  This is especially so in the cases where "application" of fairly general principles set forth by the Supreme Court are in issue, and a circuit court has actually applied Supreme Court authority in a similar situation pertinent to the case at bar.  See Duhaime v. Ducharme, 200 F.3d 597, 600-601 (9th Cir. 1999).

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

*Discussion*

A. Preclusion of Asserted Spontaneous Statement

The court sets the background for this claim by repeating the discussion of the Court of Appeal:

> Defendant contends the trial court abused its discretion when it excluded his statement to Lester Jones that he killed Collins in self-defense.  He argues that the statement was admissible as an excited utterance under Evidence Code section 1240 and that the error requires reversal under the harmless error standard of Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].
>
> Respondent contends the statement was not a spontaneous utterance because a significant period of time had elapsed between the time of the shooting and the time the statement was made. We agree with respondent.
>
> In an in limine motion, defendant sought to introduce his statement to Lester Jones, who testified that sometime after midnight on May 2nd, he received a telephone call from defendant.[2]  According to Jones, defendant told him "he had just got into it with a guy, the guy tried to kill him." Defendant asked Jones to

---

[2] The precise timing of the telephone call in terms of how long it took place after the shooting is somewhat unclear.  Petitioner argues that the telephone call occurred 15-20 minutes after the shooting, when Baylor and petitioner were together, and the court will accept that.

7

meet him at Jones' apartment complex. Ten to 15 minutes later, Jones arrived at his apartment and defendant reiterated what he had told him on the phone, that the guy was trying to shoot him so defendant shot him. Jones described defendant's demeanor as "kind of jumpy," "distraught," and "scared."

In excluding defendant's statement, the trial court stated as follows: "The Court has considered the matter and the Court is not satisfied that the utterance was made before there was time to contrive or misrepresent or in any way made while this defendant's reflective powers were still in abeyance. It appears to the Court that his reflective powers are not in abeyance; that he now wants to get away and to have people help him get away and is saying whatever is necessary to accomplish that."

Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: (a) [p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) [w]as made spontaneously while the declarant was under the stress of excitement caused by such perception."

The Supreme Court has explained the requirements for this section as follows: " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.] [¶] 'The foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' " ( People v. Poggi (1988) 45 Cal.3d 306, 318, quoting Showalter v. Western Pacific R.R. Co. (1940) 16 Cal.2d 460, 468.)

The determination whether a statement has met the requirements of the exception is "largely a question of fact" to be made by the court in its discretion. ( People v. Poggi, supra, 45 Cal.3d at p. 318.) That discretion is at its broadest when determining whether the second requirement is met. ( Ibid.) When the record supports the trial court's findings of fact, its ruling will not be disturbed on appeal. ( Id. at p. 320.)

Applying these principles, we find no abuse of discretion. Although Jones testified that defendant was distraught and jumpy when he made the statement, the trial court determined that sufficient time had elapsed between the shooting and the statement that defendant could have reflected on his actions before uttering the statement. Indeed, he appeared to be motivated by the need to find someone to help him get away. The record supports this finding.

\\\\\

> The evidence established that after the shooting, defendant ordered Baylor to take him away from the scene of the shooting, directed her to Jones' apartment, told her repeatedly that she did not see anything, and then directed her to go to the store, buy something, and then return to her apartment as if nothing had happened. These are the actions of a person who has had time to reflect on his actions and the presence of mind to take action designed to avoid detection.
>
> Accordingly, because the records support the trial court's finding that defendant's reflective powers were not in abeyance when he made the statement, we conclude the trial court did not abuse its discretion in excluding the statement.

People v. Santifer, supra at *5-6.

The precise statement by petitioner during the telephone call sought to be admitted appeared at RT 267 during a motion in limine outside the presence of the jury: "I [petitioner] got into it with a guy in the apartment complex. He tried to kill me so I shot him." It should be noted that the prosecution offered the overheard-by-Baylor part of petitioner's telephonic statements to Jones which *were admitted* at trial as admissions: "Come to the house, I just shot this nigga. I just shot this fool." RT 197. As noted by petitioner, this admitted statement was very damaging both in its content and its tone.

Petitioner understands that asserting alleged errors in application of state evidence law will get him nowhere in federal habeas corpus. Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991). In Estelle v. McGuire, the Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had granted federal habeas relief. The Court held that the Ninth Circuit erred in concluding that the evidence was incorrectly admitted under state law since, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Id. at 67-68, 112 S. Ct. at 480. The Court re-emphasized that "federal habeas corpus relief does not lie for error in state law." Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092, 3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts may not grant habeas relief where the sole ground presented involves a perceived error of state law, unless said error is so egregious as to amount to a violation of the Due Process or Equal Protection clauses of the Fourteenth Amendment).

The Supreme Court further noted that the standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." Id. at 68, 112 S. Ct. at 480. The Court also stated that in order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 73, 112 S. Ct. at 482. Habeas review does not lie in a claim that the state court erroneously allowed or excluded particular evidence according to state evidentiary rules. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

Thus, the focus is not upon whether an evidentiary mistake was made, but whether an evidentiary decision, valid or not under state law, so violated fundamental fairness, that a writ of habeas corpus must issue. Petitioner argues that since self-defense was the "heart" of petitioner's defense case, and it was, exclusion of the statement prevented him from providing critical evidence to the jury about that defense. Petitioner relies primarily on Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038 (1973) as explicated by Chia v. Cambra, 360 F.3d 997 (9th Cir. 2004). Essentially Chia stands for the proposition that the due process clause will at times override a state's evidence laws and require admission of evidence which would otherwise be precluded.

> In a habeas proceeding, we have traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion. Miller v. Stagner, 757 F.2d 988, 994 (9th Cir.), amended on other grounds, 768 F.2d 1090 (9th Cir.1985). In balancing these interests, we must, on the one hand, afford "due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable ... evidence." Miller, 757 F.2d at 995. On the other hand, we must stand vigilant guard over the principle that "[t]he right to present a defense is fundamental" in our system of constitutional jurisprudence. Perry v. Rushen, 713 F.2d 1447, 1450-51 (9th Cir.1983) (noting that "[b]ecause this right is so important, language from some cases and commentary suggests that the defendant's right carries conclusive weight, and that the exclusion of any relevant evidence is unconstitutional" (emphasis in original)). In light of these competing interests, federal habeas courts must "determine what weight the various interests will carry when placed

> on the scales," id. at 1450, and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.
>
> In assessing the interests at issue in this case, we invoke the five-part balancing test formulated in Miller. These factors include: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Miller, 757 F.2d at 994.

Chia, 360 F.3d at 1003-04.

However, one must also keep in mind that the Supreme Court in Estelle has emphasized that the times due process will trump the state court's evidence decisions will be few and far between. Furthermore, a state's evidence rules are not designed to keep reliable evidence from the trier of fact. California's evidence laws, like evidence laws in general, are designed and developed to keep *unreliable* evidence from the trier of fact. It is only in an infrequent circumstance that more or less technical requirements of state law will be bypassed to allow into evidence what the Supreme Court would consider very reliable, probative evidence.[3] Finally, in this case the state trial judge has made a finding of fact, here that petitioner was motivated by escaping punishment at the time he uttered the statement, and that substantial time had elapsed such that the spontaneity of petitioner's statement had evaporated. These factual findings in an AEDPA world may only be overcome by clear and convincing evidence. 28 § 2254(e)(1).

The undersigned does not find a due process violation in keeping petitioner's statement that the victim was attempting to kill him from the jury after consideration of the Chia factors. If believed, the probative value of the exculpatory statement would be substantial, but

---

[3] There is in fact at least superficial tension between the Supreme Court's decisions in Chambers and Crane v. Kentucky, 476 U.S. 683 (1986), decisions which petitioner correctly cites for the proposition that a state's evidence laws should be bypassed when seemingly reliable, important defense evidence is sought to be admitted, and the post-AEDPA Estelle case which instructs that state law based evidence decisions should only be reviewed federally for matters of "fundamental fairness." Chambers and Crane, while certainly not encouraging wholesale repudiation of state evidence laws, did not appear to be so restrictive. For the purposes of this case the undersigned will analyze the issues under the factors set forth in Chia which itself relies on the pre-AEDPA law.

not as great as petitioner might think. Petitioner's defense was self-defense, which unlike imperfect self-defense, relies wholly on objective factors when assessing a homicide perpetrator's belief in imminent, substantial harm to himself. People v. Humphrey, 13 Cal. 4th 1073, 1082, 56 Cal. Rptr. 2d 142, 148 (1996). Thus, petitioner's stated *subjective belief* that the victim was attempting to kill petitioner, without any underlying facts given in support of that belief in the statement at issue, is not all that probative. If the spontaneous statement had been: "I saw a gun in his hand; it was black and had a clip like device attached to the lower part of the handle," such a statement referencing an objective fact would be much more probative.

It may well be that the telephonic statement was the only real evidence that corroborated petitioner's self-defense theory at all. While there was evidence that the victim did possess a cell phone, and perhaps had it in his hand when the victim was shot, the alleged mistaking of the cell phone for a gun was fairly weak – especially because petitioner disclaimed this fact.[4] All in all, the probative value of the statement was weak.

The trial judge found from the facts that the statement was not spontaneous, and in fact, was given at a time when petitioner's motivation was to escape liability. According to the trial judge, petitioner was out of the "excited" stage from the event, and into the reflective stage. While petitioner picks at the trial judge's determination, there is nothing clear and convincing about the disagreement which would cause the undersigned to find in petitioner's favor. Thus, the trial court's finding of unreliability should stand.

---

[4] As explained below, this was not the *Venerable* case where the police just happened upon a person in the act of committing a crime, and a cell phone was mistaken for a gun. Here petitioner had been talking/arguing with the victim for a substantial amount of time, and at close range. In light of the length of time that petitioner and the victim were in close proximity, the "cell phone looked like a weapon" theory becomes implausible. Even further, despite the fact that the victim had a cell phone in his hand when found dead by the police, petitioner testified that he had the victim's cell phone just before the time of the shooting, RT 551; petitioner was never clear in his testimony why he thought the object in the victim's hand was a gun; he simply stated that he so thought. RT 555, see also RT 584 (in responding on cross-examination as to what he saw in the victim's hands: "I don't know what I saw at that time. It looked like a gun to me."). Petitioner's testimony was palpably weak.

Turning to the third <u>Chia</u> factor, the statement's credibility could have been evaluated by the trier of fact.

Petitioner testified that he saw something in the victim's hands which looked like a gun, and that he thought the victim was out to kill him. Thus, the after-the-fact statement, again by petitioner, was not the only evidence on the subject, although, if probative, it would have had a corroborative effect.

Lastly, one must assess whether the precluded evidence was a "major part of the attempted defense." It may have been a major part, but only in relative terms. Any evidence would have been "major," if only because all of petitioner's evidence combined, even including the statement, paled in comparison to the evidence in the case as a whole. The undersigned hesitates to call the after-the-fact statement a "major part of the defense."

Using the multi-factor <u>Chia</u> test, the undersigned finds for the above reasons that on balance due process was not violated by exclusion of the statement. However, one last aspect of the exclusion should be examined. The first part of petitioner's telephonic statement to Jones did come in as an admission: "Come to the house, I just shot this nigga. I just shot this fool." RT 197. No doubt this admission was highly damaging to the defense, in both its substance and tone. The second, and seemingly related, part of the telephonic statement at issue: I thought [the victim] was going to kill me, could have been argued as tempering the inflammatory tone of the admission, and certainly explaining why, in the speaker's mind, he shot the victim.

In fairness, and in evidence law, if one part of a statement is admitted, the opposing party has the right to have the full statement admitted. Fed. R. Ev. 106, Cal. Evidence Code § 356. This should be especially so if the precluded statement, while not being admissible on its own under a hearsay exception, could be argued to shed light on the admitted part. In a closer case, the admission of only the inculpatory part of the statement raises due process concerns. However, in this case, the prosecution's evidence was overwhelming that the shooting here was one fueled by alcohol, a highly exaggerated sense of insult, and a lack of understanding

of the value of human life. As stated in footnote 4, evidence of self-defense was palpably weak. In all truth, the outcome of the trial would have been no different had the exculpatory part of the telephonic conversation been admitted.

B. Preclusion of Reference to the *Venerable* Case in Final Argument

Petitioner takes the well established right for an attorney to address the jury in final argument with the defense theory of the case, and stretches it to include the right to present subsidiary references to facts outside the record.

The prosecutor, thinking he might have a problem, requested that the court preclude defense counsel in final argument from referring to the facts of a situation unrelated to the case at bar because in that situation to be referenced, ostensibly the police, upon arriving at a scene where a person was engaged in criminal activity, had mistaken a cellphone for a weapon, and opened fire on the criminal/holder of the cellphone. This case or situation was identified as the *Venerable* case; defense counsel alleged that it was a recent case of some notoriety in the community. Of course, counsel desired to argue that if the police in that situation could be mistaken, so could petitioner.

The trial court excluded the specific case reference, but not the general argument that cellphones could be mistaken for weapons.

> I certainly think you can, as a matter of argument, say, you know, it's very easy for people to mistake cellphones for guns. You can say you know, it happens and has happened, but to say in Sacramento, to say in New York, any reference like that, whether it be to the name or the location where this case comes out of, raises all the other issues as to how far away these people were, how big a cellphone, whether it's flipped open or not, whether it's pointed at the person or not. Just so many other issues that the Court would disagree with you being able to argue that okay, this has happened in Sacramento and this has happened in New York.

RT 25.

The Court of Appeal agreed:

> Closing argument may be based on matters in evidence or subject to judicial notice. (People v. Farmer (1989) 47 Cal.3d 888, 922, overruled on other grounds in People v. Waidla (2000) 22 Cal.4th 690, 724, fn. 6.) "It may also refer to

14

> matters of common knowledge or illustrations drawn from experience, history, or literature." (*Ibid*.)
>
> However, counsel has no right to confuse the jury with irrelevant facts and unrelated cases. In People v. Mendoza (1974) 37 Cal.App.3d 717, the defendant had been charged with committing a lewd act on a child under the age of 14. The court rejected the defendant's claim he should have been allowed to read newspaper clippings about two unrelated cases where children fabricated accusations against innocent men. The court reasoned that the articles concerned unrelated crimes, contained hearsay, and would have only confused the jury. However, the court noted the trial court properly permitted the defense to draw on common experience for the general proposition that children sometimes fabricate accusations against innocent persons. (*Id.* at p. 725.)
>
> The trial court's decision to prohibit reference to another trial involving different facts is discretionary (People v. Pelayo (1999) 69 Cal.App.4th 115, 122.) We therefore review the trial court's decision for abuse of discretion.
>
> Here, as in Mendoza, defendant sought to introduce specific facts from an unrelated case to demonstrate a general proposition, namely that even the police have mistaken cellular phones for guns. However, as noted by the trial court, the facts of the venerable case were not before the jury and were not commonly known. The trial court therefore properly excluded reference to it while allowing counsel to argue that a cellular phone may be mistaken for a gun. We find no abuse of discretion.

People v. Santifer, supra at *7.

While the undersigned takes no issue with the federal cases cited by petitioner as to the importance of final argument, and counsel's right to argue the theory of his case, see Herring v. New York, 422 U.S. 853, 95 S. Ct. 2550 (1975); Conde v. Henry, 198 F.3d 734 (9th Cir. 1999), this is a far cry from allowing counsel to "testify" to facts in final argument. The trial court and Court of Appeal found as a factual matter that the *Venerable* case was insufficiently in the public's knowledge of facts without controversy. Petitioner did not show in the trial court, nor here, that clear and convincing evidence demonstrates that these state courts were in error. Nor has petitioner shown that the Supreme Court of the United States would permit counsel to proffer unproven, non-public domain, facts from other cases in final argument as a matter of due process.

Indeed, the case primarily relied upon by plaintiff, Herring, held: "This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The

presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations." Herring, 422 U.S. at 862, 95 S. Ct. at 2555. This discretion, of course, relates to counsel bringing in facts from outside the record: "The trial court did not abuse its discretion in requiring counsel to confine his remarks to the record and in prohibiting counsel from making references to other cases." United States v. Spillone, 879 F.2d 514, 518 (9th Cir. 1989). The Eighth Circuit has summed up the law well:

> A trial court may not prohibit all closing argument but has "broad discretion" in limiting its scope. See Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). Closing arguments may be "limited to the facts in evidence and reasonable inferences flowing therefrom." United States v. Ojala, 544 F.2d 940, 946 (8th Cir.1976). Courts may prohibit arguments that "misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury." United States v. Sawyer, 443 F.2d 712, 713-14 (D.C.Cir.1971) (footnotes omitted).

Richardson v. Bowersox, 188 F.3d 973, 979-980 (8th Cir. 1999).

While constraints regarding final argument are not so wooden as to preclude reference to well known and indisputable facts, the trial judge here found that facts of the *Venerable* case were not so well known and would, in essence, simply lead to a side show on a controversial matter before the jury. Again, in light of the above authority, and in light of the trial judge's factual determination that the facts of the petitioner has not shown that the trial judge herein unreasonably applied controlling Supreme Court authority.

      C. <u>Whether Petitioner's Sentence Violated the Eighth Amendment</u>

Petitioner contends that the consecutive sentence of 25 years to life for the enhancement charge of using a firearm which resulted in a death, when added to the already imposed 15-life murder sentence, was grossly disproportional to the crime committed and/or simply otherwise violative of the cruel and unusual punishment provision of the Eighth Amendment. He allies this "straight" claim with one alleging ineffective assistance of counsel for not raising this issue in the trial court. However, the ineffective assistance claim is suspect since the state appellate court rejected the "straight" claim on the merits, i.e., counsel could not

have been ineffective if the claim was not meritorious. Thus, as did the state Court of Appeal, the court only looks to the straight claim here as well.[5]

The Eighth Amendment claim is not well conceptualized here. Petitioner thinks that application of the consecutive enhancement which added an additional life term was excessive. However, petitioner cannot, and does not, argue that the 15 years to life (pre-enhancement) imposed on petitioner for the second degree murder violated the federal constitution. It is well established that a life term may be imposed for murder, even second degree murder. See 18 U.S.C. § 1111(b) permitting a choice between a term of years or life [without possibility of parole] in prison for second degree murder[6]; United States v. Le Fleur, 971 F.2d 200, 211 (9th Cir. 1991) (mandatory life sentence for murder does not offend the Constitution). Thus, it is not surprising that the Supreme Court has never pronounced such a sentence, as petitioner received for murder, to be constitutionally unacceptable.

The fact that petitioner received two life sentence does not change petitioner's actual sentence. In one sense, the consecutive life sentence for use of a gun resulting in death, adds nothing to the sentence. A sentence beyond one life sentence is meaningless, i.e., one life sentence plus one life sentence equals only one life sentence. And, the Eighth Amendment's standard of cruel or disproportionate punishment is gauged against the maximum, statutory sentence. Except in rare, truly extraordinary, circumstances, a sentence will not be overturned on Eighth Amendment grounds if it lies within the statutory maximum. United States v. Mejia Mesa, 153 F.3d 925, 930 (9th Cir. 1998). Certainly, a life sentence for murder would not be

---

[5] The court will not textually discuss petitioner's claim that the sentence violated the California Constitution, or that counsel was ineffective in not raising the state claim. The California Court of Appeal ruled as a matter of state law that the sentence did not violate the California Constitution. This court will not accept petitioner's invitation to "overrule" the state court on matters of state law because it "wrongly applied" state case law. See Estelle v. McGuire, supra.

[6] Since there is no parole in the federal system, "life means life." It is imposed without the possibility of parole.

17

overturned no matter how many theoretical "lifes" are added to it.

Thus, petitioner's claim must be that the adding of minimum terms, the 15 years for murder and the 25 years for the gun enhancement for a total of 40 years is the unconstitutional aspect of the total sentence. The only practical effect on the sentence of addition of minimum terms is that the time before which parole may even be considered is greatly extended, and the minimum time which must be served in any event is 40 years. This claim fails for two reasons. First, in California law, the mere possibility of parole does not transmute a life sentence into something lesser than a life sentence.

> As we indicated in Wingo, supra, 14 Cal.3d 169, 121 Cal.Rptr. 97, 534 P.2d 1001, "traditionally '[o]ne who is legally convicted has no vested right to the determination of his sentence at less than maximum' [citation]. Moreover, 'a defendant under an indeterminate sentence has no "vested right" to have his sentence fixed at the term first prescribed by the [parole authority] "or any other period less than the maximum sentence provided by statute." ' [Citations.] 'It has uniformly been held that the indeterminate sentence is in legal effect a sentence for the maximum term' [citation], subject only to the ameliorative power of the [parole authority] to set a lesser term. [Citations.]" ( Id. at p. 182, 121 Cal.Rptr. 97, 534 P.2d 1001.) Indeed, "'[i]t is fundamental to [an] indeterminate sentence law that every such sentence is for the [statutory] maximum unless the [parole] [a]uthority acts to fix a shorter term.'"

In re Dannenberg, 34 Cal. 4th 1061, 1097-98, 23 Cal. Rptr. 3d 417 (2006).

Under California law, petitioner has no legal expectation, or "right" to be released at the end of his minimum term.[7] For Eighth Amendment analytical purposes, he is serving a life sentence. Thus, we are back to the above equation where petitioner, in practical effect, only received one life sentence for murder with use of a gun.

Bottom line here – if the federal case law and federal statutes allow imprisonment for life without possibility of parole, and they do even for "simple" second degree murder, § 1111(b), supra, the sentence imposed here for second degree murder enhanced by use of a gun is less than the federal maximum penalty. It therefore cannot violate the Eighth Amendment in the

---

[7] Whether other statutes in California law require the BPH (formerly BPT) to have a valid basis for parole eligibility decisions is a different issue from that presented here.

absence of a Supreme Court decision striking down the federal maximum penalty – and none exists.

Secondly, even if California law did not treat a life sentence as a life sentence, petitioner cites to no Supreme Court authority, and the court is not aware of any, that the minimum time to be spent incarcerated before the state may *consider* parole for a validly imposed life sentence, or the mandatory time which must be served before parole *may* be ordered, is subject to Eighth Amendment scrutiny.

In light of the Supreme Court decisions of <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S.Ct. 1166 (2003) and <u>Ewing v. California</u>, 538 U.S. 11, 123 S. Ct. 1179 (2003), which demand the utmost deference to state legislatures on the penalties to be imposed for crimes, and which state determinations will be overturned only in a "rare," "extraordinary" situation, the penalty imposed on petitioner herein stands clearly within the acceptable Eighth Amendment range.

*Conclusion*

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   10/12/07                              /s/ Gregory G. Hollows

                                                              UNITED STATES MAGISTRATE JUDGE

GGH:ggh
sant2513.fr